**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **C. PEPPER LOGISTICS, LLC,** | ) | |
| | ) | |
| **TIMELESS LOGISTICAL SOLUTIONS, INC.,** | ) | Cause No. 4:20-cv-01444-MTS |
| | ) | |
| **INDEPENDENT SERVICE PROVIDER, LLC,** | ) | |
| | ) | |
| **LOGISTICS RESOURCE SOLUTIONS, INC.,** | ) | **AMENDED COMPLAINT FOR** |
| | ) | **INJUNCTIVE RELIEF AND** |
| **INTERSTATE SERVICE PROVIDER, INC.,** | ) | **DAMAGES** |
| | ) | |
| **LRS LEASING, LLC.,** and | ) | |
| | ) | |
| **JONATHAN PEPPER**, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LANTER DELIVERY SYSTEMS, LLC,** | ) | |
| | ) | |
| **WHITE LINE SYSTEMS, LLC,** | ) | |
| | ) | |
| **DARIEN BROKERAGE, LLC,** | ) | |
| | ) | |
| **RACHEL TOMASEK,** | ) | |
| | ) | |
| **MIKE TOMASEK,** | ) | |
| | ) | |
| **ANTON LOBOV,** | ) | |
| | ) | |
| **ANTOINE WINGARD,** | ) | |
| | ) | |
| **MARK CORDSEN,** | ) | |
| | ) | |
| **RANDI WOOD,** | ) | |
| | ) | |
| **RYDER TRUCK RENTAL, INC.,** | ) | |
| **d/b/a RYDER TRANSPORTATION** | ) | |
| **SERVICES,** | ) | |
| | ) | |
| <u>Serve</u>:  Corporate Creations Network, Inc. | ) | |
|        12747 Olive Blvd., Suite 300 | ) | |
|        St. Louis, MO 63141 | ) | |



EXHIBIT
D

|                              |   |
|------------------------------|---|
| **JOHN DOES 1 THROUGH 30,**  | ) |
|                              | ) |
|                              | ) |
| **HOLD SERVICE,**            | ) |
|                              | ) |
| Defendants.                  | ) |

## <u>AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiffs **C. PEPPER LOGISTICS, LLC, TIMELESS LOGISTICAL SOLUTIONS, INC., INDEPENDENT SERVICE PROVIDER, LLC, LOGISTICS RESOURCE SOLUTIONS, INC., INTERSTATE SERVICE PROVIDER, INC., LRS LEASING, LLC** (collectively "Plaintiffs" or "Pepper Companies") for their cause(s) of action against Defendants **LANTER DELIVERY SYSTEMS, LLC, WHITE LINE SYSTEMS, LLC, DARIEN BROKERAGE, LLC, RACHEL TOMASEK, MIKE TOMASEK, ANTON LOBOV, ANTOINE WINGARD, MARK CORDSEN, RANDI WOOD, RYDER TRUCK RENTAL, INC., d/b/a RYDER TRANSPORTATION SERVICES and JOHN DOES 1 THROUGH 30** (collectively "Defendants"), state, aver, and allege as follows:

1.      This lawsuit arises from the coordinated plan of Defendants to disable and kill the Pepper Companies by unlawfully depriving Plaintiffs of the very means by which they operate their logistics and delivery companies.

2.      Defendants, their agents and co-conspirators devised the plan and orchestrated it out of the headquarters of Defendant Lanter Delivery in St. Louis County, State of Missouri on August 22, 2020.

3.      Defendants' scheme included: hijacking and converting approximately 1,000 vehicle power units and trailers (tractor-trailers), which belonged to Plaintiff Logistics Resource; stealing and withholding the Pepper Companies' payroll information; wrongly and tortiously interfering with contracts that the Pepper Companies had with about 700 drivers who were

2

independent contractors ("drivers"); having said drivers drive for Defendants in violation of the Federal Motor Carrier Safety Regulations ("FMCSR"); unlawfully accessing the Pepper Companies' confidential information; and illegally withholding the Pepper Companies' protected property.

4.    Simply put, Defendants' carefully planned and orchestrated plot was a *coup d'état*.

5.    Plaintiffs file this cause of action in an effort to save their businesses from the calculated schemes, artifices, statutory and regulatory violations, and other actions of Defendants to disable Plaintiffs and put them out of business.

### Parties, Jurisdiction and Venue

6.    **C. PEPPER LOGISTICS, LLC** ("C Pepper"), is a Missouri limited liability company in good standing with the Missouri Secretary of State.

7.    **TIMELESS LOGISTICAL SOLUTIONS, INC.** ("Timeless Logistical"), an Illinois corporation, with a primary address of 1600 Wayne Lanter Drive, Madison, IL 62060. Timeless Logistical Solutions provides service to its primary customer, LANTER DELIVERY SYSTEMS, LLC, in St. Louis County, State of Missouri.

8.    **INDEPENDENT SERVICE PROVIDER, LLC** ("Independent Service"), is a Missouri limited liability company in good standing with the Missouri Secretary of State.

9.    **LOGISTICS RESOURCE SOLUTIONS, INC.** ("Logistics Resource"), is an Illinois corporation, registered to do business in the State of Missouri, with a primary address of 1600 Wayne Lanter Drive, Madison, IL 62060. Timeless Logistical Solutions provides service to its primary customer, LANTER DELIVERY SYSTEMS, LLC, in St. Louis County, State of Missouri.

10.    **INTERSTATE SERVICE PROVIDER, INC.** ("Interstate Service"), is a Texas corporation, with a primary address of 899 Henrietta Creek Road, Ste. 200, Roanoke, TX 76262.

11.     **LRS LEASING, LLC.** ("LRS Leasing"), is an Illinois limited liability company in good standing with the Illinois Secretary of State.

12.     **JONATHAN PEPPER** ("Pepper"), is an individual residing in the State of Missouri.

13.     Defendant **LANTER DELIVERY SYSTEMS, LLC** is a Delaware limited liability company, registered to do business in the State of Missouri, with its corporate headquarters and primary place of business at 13075 Manchester Road, Suite #300, Des Peres, MO 63131.

14.     Defendant **WHITE LINE SYSTEMS, LLC** is a Texas limited liability company with a physical address of 1050 East Grantline Rd, Tracy, CA 95376 and a mailing address of 8101 BOATCLUB RD #240-4002, FORT WORTH, TX, 76179-3631. Defendant WHITE LINE SYSTEMS, LLC is registered as a DOT for hire interstate motor carrier of property with USDOT Number 3275987, with registered agent, WILLIAM F FERRELL, 623 State Highway H, Sikeston, MO 63801.

15.     Defendant **DARIEN BROKERAGE, LLC**, is a Texas limited liability company with a physical address of 1050 East Grantline Rd, Tracy, CA 95376 and a mailing address of 8101 BOATCLUB RD #240-4002, FORT WORTH, TX, 76179-3631. Defendant **DARIEN BROKERAGE, LLC** is registered as a DOT broker with USDOT Number 3276672, with registered agent, WILLIAM F FERRELL, 623 State Highway H, Sikeston, MO 63801.

16.     Defendant **RACHEL TOMASEK** is a married individual residing in Elburn, IL and was the Office Manager of LOGISTICS RESOURCE SOLUTIONS, INC. and other Pepper Companies.

17.     Defendant **MIKE TOMASEK** is a married individual residing in Elburn, IL and was the Regional Transportation Manager of the Pepper Companies.

4

18.     Defendant **ANTON LOBOV** is a single individual residing in Pantego, TX and was the Regional Transportation Manager of LOGISTICS RESOURCE SOLUTIONS, INC. and other Pepper Companies.

19.     Defendant **ANTOINE WINGARD** is an individual residing in Concord, NC and was the Transportation Manager of the Charlotte area for LOGISTICS RESOURCE SOLUTIONS, INC.

20.     Defendant **MARK CORDSEN** is an individual residing in Aurora, CO and was the Transportation Manager of the Denver area for LOGISTICS RESOURCE SOLUTIONS, INC.

21.     Defendant **RANDI WOOD** is an individual residing in Olathe, KS and was a Regional Transportation Manager of the Kansas area for LOGISTICS RESOURCE SOLUTIONS, INC.

22.     Defendant **RYDER     TRUCK     RENTAL,     INC.,     d/b/a     RYDER TRANSPORTATION SERVICES** is a is Florida for-profit corporation, registered to do business in the State of Missouri, with its corporate headquarters 11690 NW 105 Street, Miami, Florida 33178, and with places of business throughout the United States, including within the jurisdiction of this Court.

23.     **DOES 1 – 30** are persons or corporate entities whose identities are presently unknown but whose actions and/or inaction may have contributed to and/or caused the injury and damage to Plaintiffs Pepper Companies as shall be learned through discovery in this lawsuit.

24.     This Court has jurisdiction over Defendants because the causes of action asserted against them arise out of the transaction of business or the making of contracts within the State of Missouri, and because the tortious conduct alleged herein occurred in the State of Missouri and/or occurred so that the effect of the tortious conduct was aimed at the State of Missouri and the

5

defendants reasonably anticipated that their tortious conduct would cause them to be haled into the courts in the State of Missouri.

25.     Subject matter jurisdiction is proper pursuant to 28 U.S.C. section 1331, 1367, 1441, 1446 and venue in this Court is proper pursuant to 28 U.S.C. section 1441(a) and E.D. Mo. L.R. 2.07(a)(1).

**Background Facts Relating to All Counts**

26.     This lawsuit arises out of the tortious and wrongful conduct and schemes of Defendants which were orchestrated from the headquarters of Lanter Delivery in St. Louis County, State of Missouri, in which as described in more detail below Defendants improperly:

    a.  Hijacked, converted, and took possession of approximately 1,000 power units and trailers in which Logistics Resource had an exclusive possessory leasehold interest from Ryder, Penske and others;

    b.  Took possession of LRS Leasing's electronic property, which was located within the power units and trailers described above;

    c.  Caused C Pepper, Timeless Logistical, Independent Service, Interstate Service's drivers to breach their independent contractor agreements or brokerage agreements;

    d.  Caused C Pepper, Independent Service, and/or Logistics Resource's managers and other employees to breach their duties of loyalty and fiduciary duties;

    e.  Caused C Pepper, Independent Service, and/or Logistics Resource's managers and employees to violate trade secrets acts and Defend Trade Secrets Act and transmit proprietary and confidential information of Pepper Companies to Lanter Delivery, White Line, and Darien Brokerage;

6

f. Violated the Federal Motor Carrier Safety Regulations ("FMCSR") (49 CFR Parts 390 and 391) by having drivers drive without a valid "application for employment" or a valid pre-employment controlled substances and alcohol test, or valid placards on their trucks;

g. Unlawfully coerced and/or abetted drivers to violate the Federal Motor Carrier Safety Regulations in violation of 49 CFR §§ 390.6(a) and 390.13;

h. Violated Federal Motor Carrier Leasing Regulations (49 CFR Part 376) by utilizing Pepper Companies' equipment without valid leases from Pepper Companies while Logistics Resource had the right to exclusively use said equipment;

i. Utilized promissory notes which Lanter Delivery had not previously intended to collect upon to leverage the financial hardship upon Plaintiffs; and

j. Tortiously interfered with C Pepper, Timeless Logistical, Independent Service, and Interstate Service's business expectations with Non-Lanter Customers by causing lessors to breach lease agreements relating to the lease of equipment.

27. As alleged hereinbelow, each member of the conspiracy committed a wrongful act in furtherance of the conspiracy which permits all conspirators to be liable for the wrongful acts alleged herein.

28. Lanter Delivery is operated by Steve Lanter and Bo Lanter from its headquarters in St. Louis County, State of Missouri.

29. Jim Pepper worked for Defendant Lanter Delivery from 1991 to 1997 holding various positions.

7

30.     Pepper left Lanter Delivery in 1997 and started Express Delivery Logistics, which became a Designated Carrier Partner (DCP) for Lanter Delivery. Express Delivery Logistics eventually became Independent Service Provider, Inc.

31.     As Lanter Delivery grew from using minivans to deliver various products to its customers, to using power units and trailers, Pepper's companies grew as well.

32.     By 2012, Pepper Companies had grown to bill Lanter Delivery approximately $5 million per year, but the Pepper Companies operated on a slim margin. By August 22, 2020, Pepper Companies comprised approximately 50% of Lanter Delivery's DCPs. The remaining 50% was comprised of numerous, much smaller, DCPs which worked with Lanter Delivery.

33.     The customers of Lanter Delivery required overnight delivery of emergency critical parts and daily stock orders. Overnight nighttime delivery is what Lanter Delivery considers a unique service in which it provides regularly-scheduled weekday pick-up at distribution centers to make scheduled next morning deliveries to its customers' stores, dealers, or branches.

34.     It is believed that the penalty provisions in the contracts Lanter Delivery has with its customers were factors contributing to cause Lanter Delivery's reckless actions including spearheading the conspiracy, engaging others to join and partake in conduct which violated state and federal statutes and regulations.

35.     As a DCP, C Pepper, Timeless Logistical, Independent Service, and Interstate Service had written contracts with drivers to pilot power units, which Pepper Companies leased from various individuals and entities (including Ryder and Penske Truck Leasing Co, L.P.). These drivers had substantially similar written contracts with C Pepper, Timeless Logistical, Independent Service, and Interstate Service which included requirements for, among other things:

> a.   10-day notice provision prior to termination of the independent contractor agreement by either party;

8

b.   Requirement to return units back to Logistics Resource and to provide a written receipt for same;

c.   Calculations for compensation, escrow funds, and allocation of expenses.

36.     Between 1997 and 2020, Lanter Delivery worked with many other DCPs in addition to Pepper Companies. Those relationships failed as those DCPs were unable to meet a mutually agreeable contract with Lanter Delivery.

37.     The units of C Pepper, Timeless Logistical, Independent Service, and Interstate Service were equipped with lift gate trailers, which allowed them to engage in the delivery of specialty equipment that other major carriers did not possess.

38.     C Pepper, Timeless Logistical, Independent Service, Interstate Service, and Logistics Resource were also able to engage in overnight and emergency deliveries.

39.     Pepper Companies maintained offices on property owned and/or possessed by Lanter Delivery in Madison, Illinois, Rock Island, IL, Shreveport LA, Forest Park, GA, Buford, GA, Knoxville, TN, Johnson City, TN, Macon GA, Orlando, FL, Fort Lauderdale, FL, Garden City, GA, Tampa, FL, Aurora, CO, Billings, MT, Salt Lake City, UT, West Fargo, ND, Olathe, KS, Hays, KS, Charlotte, NC, Greensboro, NC, Bloomington, IL, Minooka, IL, Murfreesboro, TN, Lafayette, LA, Brandon, MS, Morrisville, NC, Memphis, TN, Roanoke, TX, Corpus Christi, TX, Abilene, TX, Austin, TX, Houston, TX, Forest Park, GA, Tifton, GA, Bismarck, ND, Sioux Falls, SD, and Greenville, SC.

40.     From approximately 2018 to early 2020, Lanter Delivery began denying rate increases to Timeless Logistical, regarding many expenses but specifically vehicle insurance and physical and operational expenses.

41.     In July, 2019, Timeless Logistical elected not to renew the written contract with Lanter Delivery. Pepper Companies and Lanter Delivery began immediately negotiating terms for

9

a mutually beneficial revised agreement while the companies continued to work together, with Pepper Companies continuing to serve as a DCP to Lanter Delivery.

42.     The negotiations came to an abrupt end on Saturday, August 22, 2020.

43.     That day, August 22, 2020, Timeless Logistical received a Notice of Discontinuation of Services on Lanter Delivery letterhead from its office in St. Louis County, State of Missouri, indicating among other things, that:

> a.  Lanter Delivery was discontinuing the services of Timeless Logistical with immediate effect;
>
> b.  Lanter Delivery engaged an existing DCP to "assume responsibility for operating in the markets currently operated by Timeless [Logistical]"; and
>
> c.  Timeless Logistical was directed to remove "all Equipment" from Lanter Delivery facilities.

44.     This Notice of Discontinuation of Services came as a complete surprise to the Pepper Companies as it learned that day that a conspiracy had been carefully planned over an extended period of time and then executed by Defendants such that Logistics Resource was no longer able to access the approximately 1,000 power units and trailers it leased, their employees and managers were sharing proprietary and confidential information with Lanter Delivery and White Line, and its drivers had been manipulated through threats and intimidation into immediately working for Lanter Delivery and White Line without having given C Pepper, Timeless Logistical, Independent Service, and Interstate Service the contractually-required 10-day notice.

45.     On this same day, due to advanced coordination with Lanter Delivery, White Line, and Darien Brokerage, Ryder (a key vendor to Pepper Companies) had sequestered power units and trailers away from the access of Pepper Companies and directed a communication to Pepper

10

Companies declaring an anticipatory breach of the Truck Lease and Service Agreement dated April 11, 2014 which Pepper Companies had with Ryder.

### Drivers and Former Attorneys of Pepper Companies

46.     As part of the plan to disable and kill the Pepper Companies, representatives of Lanter Delivery, White Line, and Darien Brokerage on or before August 22, 2020 met with managers of the Pepper Companies and drivers at the following terminal locations:  Madison, Illinois, Rock Island, IL, Shreveport LA, Forest Park, GA, Buford, GA, Knoxville, TN, Johnson City, TN, Macon GA, Orlando, FL, Fort Lauderdale, FL, Garden City, GA, Tampa, FL, Aurora, CO, Billings, MT, Salt Lake City, UT, West Fargo, ND, Olathe, KS, Hays, KS, Charlotte, NC, Greensboro, NC, Bloomington, IL, Minooka, IL, Murfreesboro, TN, Lafayette, LA, Brandon, MS, Morrisville, NC, Memphis, TN, Roanoke, TX, Corpus Christi, TX, Abilene, TX, Austin, TX, Houston, TX, Forest Park, GA, Tifton, GA, Bismarck, ND, Sioux Falls, SD, and Greenville, SC.

47.     Managers of the Pepper Companies were coerced, incentivized, and manipulated by Lanter Delivery, White Line, and Darien Brokerage with promises of "huge" signing bonuses and pay increases to shift their allegiance from Pepper Companies to Lanter Delivery and its new primary DCPs:  White Line and Darien Brokerage.

48.     Both White Line and Darien Brokerage are, upon information and belief, owned and operated by Alonzo White.

49.     As an important element of the plan to disable and kill the Pepper Companies, Lanter Delivery, White Line, and Darien Brokerage, without authorization, took the schedules and cell phone numbers and other information of Plaintiff's approximately 700 drivers nationwide, as well as other information not previously available to Lanter Delivery as detailed below, through these managers.

11

50.     In turn, these former Pepper Company managers now working for White Line and Darien Brokerage, with direction from representatives of Lanter Delivery, demanded that drivers drive for White Line and Darien Brokerage beginning on August 22, 2020, despite knowing that most drivers had independent contractor agreements with the Pepper Companies which required 10 days' notice to terminate, along with other legal obligations.

51.     At the numerous surreptitious meetings between the drivers and former Pepper Company managers now working for White Line and Darien Brokerage, with direction from representatives of Lanter Delivery and White Line, the drivers of Pepper Companies were told in person, or via cell phone that:

          a.   drivers would receive a bonus of $200 for Class A drivers and $100 for Class C drivers if they left Pepper Companies and "signed on" to White Line;

          b.   drivers would receive a bonus of $300 for Class A drivers and $200 for Class C drivers for recruiting 100% of the other drivers away from Pepper Companies to sign on to White Line; and

          c.   Class A drivers would receive a $200 bonus if they took a drug test.

52.     Additionally, these drivers were informed by representatives of Lanter Delivery and White Line that they would protect the drivers and take care of them if there was any adverse action taken against those drivers by the Pepper Companies or governmental agencies responsible for enforcement of FMCSR.

53.     The drivers were warned by Lanter Delivery and White Line that if they communicated with Pepper Companies in any way so as to inform them of these meetings, even if to give Pepper Companies the contractually-required termination notice, said drivers would be ineligible for hire by White Line.

54.     Finally, after these threats and coercive steps and actions in furtherance of the scheme, White Line, Darien Brokerage, and Lanter Delivery, placing the proverbial gun to their head, gave the drivers only seconds to decide if they were going to then work for White Line and Darien Brokerage, or if they would be without access to their livelihood.

55.     As a piece of the coordinated plan by Lanter Delivery and its co-conspirators, Pepper Companies received a cease-and-desist communication on August 22, 2020 from a law firm representing Lanter Delivery, Darien Brokerage, and/or White Line. Incredibly, this same law firm had previously advised Pepper Companies on multiple matters relating to Lanter Delivery.

56.     This purported cease-and-desist, issued on the same day Defendants executed their plan at locations across the United States, deceptively sought to warn Pepper Companies not to interfere with Pepper Companies' very own "drivers and motor carriers who have agreed to do business (or contracted) with White Line in order to service Lanter's customers in connection with Lanter's contract with Darien Brokerage."

57.     This cease-and-desist communication specifically admitted Lanter Delivery's knowledge of the existence of the noncompete agreements Pepper Companies had with the drivers.

58.     The cease-and-desist communication was part of Defendants' plan and was written to protect Lanter Delivery's interests.

59.     The cease-and-desist communication intentionally and deceptively stated that "Lanter is not hiring or engaging any of the workers at issue, and so it obviously has no intent to violate any enforceable noncompete agreement your client has with anyone, drivers included. Lanter has made that clear to Darien Brokerage and White Line, and we know they feel the same."

60.     As part of its disable and kill plan, at the very same time, Lanter Delivery was deceiving the Pepper Companies by falsely claiming it had no intention of hiring its drivers or

13

managers, Lanter Delivery was telling the drivers that it would represent the drivers if there was a suit with Pepper Companies and would otherwise "protect them."

61.     The same day, August 22, and as described in more detail below, Ryder personnel directed the drivers to remove all their personal property from the power units and then Ryder sequestered and moved the units to areas where agents of Pepper Companies could not access them.

62.     Ryder personnel went so far as to use non-Pepper Companies power units and trailers to box in those power units and trailers owned by Pepper Companies so that Pepper Companies were utterly and wholly dispossessed of any ability to access them.

63.     The result of these actions was the power units and trailers were in the possession of Ryder, and to the exclusion of Pepper Companies.

64.     The same day, August 22, the drivers were directed by White Line, Darien Brokerage, and Lanter Delivery to unlawfully drive Logistics Resource's nearly 1,000 power units and trailers with the aid and complicity of Ryder, which were all subject to valid leases and in which Logistics Resource had an exclusive possessory interest and exclusive right to use.

65.     Upon the direction of White Line, Darien Brokerage, Lanter Delivery, and Ryder, the drivers employed by White Line and Darien Brokerage, and paid by Lanter Delivery, hijacked Logistics Resource's power units and trailers leased from Ryder, which also included Pepper Electronic Property maintained in said power units and trailers, and drove said power units and trailers the rest of the week for the benefit of Lanter Delivery, White Line, and Darien Brokerage, with the aid and complicity of Ryder and without authorization or consent of the Pepper Companies.

66.     Upon the direction of White Line, Darien Brokerage, and Lanter Delivery the drivers employed by White Line and Darien Brokerage, and paid by Lanter Delivery, hijacked

14

Logistics Resource's power units and trailers leased from Penske and others, which also included Pepper Electronic Property maintained in said power units and trailers, and drove and continue to drive many of said power units and trailers (while Logistics Resource still has an exclusive possessory interest) for the benefit of Lanter Delivery, White Line, and Darien Brokerage and without authorization or consent of the Pepper Companies.

67.     White Line, Darien Brokerage, Lanter Delivery, and Ryder's plan to not only deprive Pepper Companies of possession of its power units and trailers, but also to use Pepper Companies' power units and trailers without authorization and consent, was an important part of the scheme in order to continue to timely deliver products to Lanter Delivery's customers. For the week ended August 22, 2020, Lanter Delivery paid those drivers who switched their allegiance to White Line on August 22, 2020.

68.     By driving Logistics Resource's power units and trailers , the drivers were violating the FMCSR by:

  a. Driving without a valid "application for employment" in violation of 49 C.F.R. section 391.21;

  b. Driving without a valid pre-employment controlled substances and alcohol test in violation of 49 C.F.R. section 382.301;

  c. Driving Logistics Resource's power units and trailers while violating Federal Motor Carrier Leasing Regulations (49 CFR Part 376) by utilizing Pepper Companies' equipment without valid leases from Pepper Companies while Logistics Resource's had the right to exclusively use said equipment; and/or

  d. Driving equipment with DOT placards of the Pepper Companies without permission in violation of 49 C.F.R. section 390.21.

15

69.     Likewise, Defendants White Line, Darien Brokerage, and Lanter Delivery, violated the aforesaid FMCSR by virtue of 49 C.F.R. section 390.11.

70.     Lanter Delivery, White Line, and/or Darien Brokerage improperly coerced said drivers to violate the aforesaid FMCSR, which is a violation of 49 C.F.R. section 390.6.

71.     Lanter Delivery, White Line, and/or Darien Brokerage aided, abetted, encouraged or required said drivers to violate the aforesaid FMCSR, which is a violation of 49 C.F.R. section 390.13.

72.     Lanter Delivery, White Line, and/or Darien Brokerage, with the aid and complicity of Ryder, used the equipment without a written lease with Logistics Resource, the "owner" of the equipment, for Lanter Delivery, White Line, and/or Darien Brokerage's benefit in violation of 49 C.F.R. sections 376.11 and 376.12.

### Faithless Employees of Pepper Companies

73.     Lanter Delivery, White Line, and/or Darien Brokerage had communications to lure away many employees, including managers and regional managers, of Pepper Companies.

74.     Lanter Delivery, White Line, and/or Darien Brokerage began the process to lure away managers and regional managers of Pepper Companies well before August 22, 2020.

75.     For instance, in July 2020, Mike Tomasek (a senior regional manager) and Rachel Tomasek (the account manager) flew to Texas to meet with Alonzo White to plan the actions necessary to pull off the August 22 *coup d'état*.

76.     Mike Tomasek and Rachel Tomasek provided crucial insider knowledge to White Line, Darien Brokerage, and Lanter Delivery.

77.     From this meeting, Lanter Delivery, Ryder, White Line, and Darien Brokerage included the then-present employees of Pepper Companies, and co-conspirators Mike Tomasek

and Rachel Tomasek into their scheme to take over the drivers, power units, equipment, and business of Pepper Companies.

78.     On Wednesday, August 19, 2020, Mike Tomasek emailed "Wisconsin IC Payroll Week Ending 8/15/20" from his Independent Service Provider email account to his personal Hotmail email account. There was no reason to email this document to his personal email in the ordinary course of business.

79.     On the same date, August 19, 2020, Mike Tomasek emailed "Chicago IC Payroll Week Ending 8/15/20" from his Independent Service Provider email account to his personal Hotmail email account. There was no reason to email this document to his personal email in the ordinary course of business.

80.     The documents Mike Tomasek emailed on August 19, 2020 contained confidential and proprietary information for Independent Service driver information, daily rate compensation, payment for "specials," and other information.

81.     Upon information and belief, this information of Pepper Companies was emailed by Mike Tomasek to Lanter Delivery offices in St. Louis, Missouri in furtherance of the conspiracy.

82.     In so doing, Mike Tomasek was acting at the direction of, and as an agent for, Lanter Delivery, White Line, Darien Brokerage, and Ryder, in furtherance of their scheme and conspiracy.

83.     On Friday, August 21, 2020 the management of Lanter Delivery communicated from its office in St. Louis County, State of Missouri, with representatives of White Line as they finalized the plan and scheme to hijack and convert Logistics Resource's equipment with an email that stated:

Don [O'Connell],

17

Colin [Sachtleben] and I [Chris Baer] have attached the Rockies Equipment master control document to complete the documentation of your equipment moves beginning on 8/22.

Please note the following worksheets:

1.   Current Lease Power Fleet
     a.   Complete column G Current Delivery X Dock
     b.   Complete column H Transferred to Location
2.   Current Lease Trailer Fleet
     a.   Complete column G Current Delivery X Dock
     b.   Complete column H Transferred to Location
3.   Temporary Rental Power Fleet
     a.   Complete column H Transferred to Location
4.   Temporary Rental Trailer Fleet
     a.   Complete column J Transferred to Location

Thanks, in advance, for your assistance in completing this file.

This will provide vital information to approve rental invoices, validate current fleet profile, and to efficiently manage the exchange of all lease and rental equipment.

84.     After the takeover weekend, this email was re-circulated to individuals, including Cordsen, to provide an update to White Line and Lanter Delivery as to the status of the Ryder equipment.

85.     Representatives for Lanter Delivery, White Line, and/or Darien Brokerage met with other managers and regional managers at the terminal offices of Pepper Companies in the early morning of August 22, 2020, which were spread across the nation, and gave them the ultimatum that they were to switch allegiances and join the employment of White Line or they would be "fired."

86.     In some instances, the representatives of Lanter Delivery, White Line, and/or Darien Brokerage told the manager and/or regional manager that they would be fired by the Pepper Company for which they worked. In others, it was represented that the manager and/or regional

manager would not be hired by White Line in the same position once the coup was completed if they did not instantly agree to the defection.

87.     In every instance, however, said manager and/or regional manager was only given seconds to make his or her decision. Further, in every instance, said manager and/or regional manager was expressly directed not to call or otherwise contact any representative of Pepper Companies to advise them as to what was occurring at their terminals so that no action could be taken by Pepper Companies to stop the plot.

88.     On August 22, 2020, in carrying out the scheme to disable and kill Pepper Companies, which was planned in St. Louis County, State of Missouri, representatives of Lanter Delivery, White Line, and Darien Brokerage met with managers of Pepper Companies at Madison, Illinois, Rock Island, IL, Shreveport LA, Forest Park, GA, Buford, GA, Knoxville, TN, Johnson City, TN, Macon GA, Orlando, FL, Fort Lauderdale, FL, Garden City, GA, Tampa, FL, Aurora, CO, Billings, MT, Salt Lake City, UT, West Fargo, ND, Olathe, KS, Hays, KS, Charlotte, NC, Greensboro, NC, Bloomington, IL, Minooka, IL, Murfreesboro, TN, Lafayette, LA, Brandon, MS, Morrisville, NC, Memphis, TN, Roanoke, TX, Corpus Christi, TX, Abilene, TX, Austin, TX, Houston, TX, Forest Park, GA, Tifton, GA, Bismarck, ND, Sioux Falls, SD, and Greenville, SC.

89.     At these numerous surreptitious meetings, the Managers of Pepper Companies were told by representatives of Lanter Delivery that:

> a.  Managers would receive a bonus of $1,000 if they left Pepper Companies and "signed on" to White Line;
>
> b.  Managers would receive a $1,000 bonus for recruiting 100% of the drivers away from Pepper Companies to sign on to White Line; and
>
> c.  Managers would receive a $1,000 bonus if the drivers retained ran every day for 5 weeks.

19

90.     Additionally, the managers and regional managers accessed the computer systems of Pepper Companies while they were employees of Pepper Companies and well beyond any access authorized by their employment.

91.     The managers and regional managers accessed the computer systems of Pepper Companies while they were employees of Pepper Companies and did so while their interests were contrary to the interests of Pepper Companies.

92.     In the event the managers and regional managers accessed the computer systems of Pepper Companies *after* they left the employment of Pepper Companies, then said managers and regional managers were trespassing in the offices of Pepper Companies and had no legal rights whatsoever to access the computer system of Pepper Companies.

93.     In either instance the managers and regional managers were acting as employees or agents, and within the course and scope of authority of their employment or agency, of White Line, Darien Brokerage, and/or Lanter Delivery, and as a result White Line, Darien Brokerage, and/or Lanter Delivery are vicariously liable for the actions of RACHEL TOMASEK, MIKE TOMASEK, ANTON LOBOV, ANTOINE WINGARD, MARK CORDSEN, RANDI WOOD, and JOHN DOES 1 THROUGH 30.

94.     For example, as part of the scheme in which Lanter Delivery, White Line, Darien Brokerage, and others were involved, on August 22, 2020 at 1:25 PM, Anton Lobov, a Regional Transportation manager emailed, from his Logistics Resource Solutions email address, to three employees of White Line at White Line email addresses, the "San Antonio Payroll for weekend ending 8.22.2020." Attachments to this email consisted of two Excel spreadsheets.

95.     In so doing, Lobov was acting at the direction of, and as an agent for, Lanter Delivery, White Line, Darien Brokerage, Ryder, Mike Tomasek, and Rachel Tomasek in furtherance of their scheme and conspiracy.

96.     The first Excel spreadsheet contained the Active Driver List for San Antonio by name, vehicle type, area, etc. Just for completeness, Lobov also included Terminated drivers in his information, which he provided to White Line.

97.     The second Excel spreadsheet Lobov attached in his email to White Line contained the San Antonio Payroll for not just the weekend ending August 22, but also:

    a.  Week ending June 27, 2020

    b.  Week ending July 4, 2020

    c.  Week ending July 11, 2020

    d.  Week ending July 18, 2020

    e.  Week ending July 25, 2020

    f.  Week ending August 1, 2020

    g.  Week ending August 8, 2020

    h.  Week ending August 15, 2020

    i.  Week ending August 22, 2020

98.     This payroll was for drivers, Managers and contained all notes (including medical and legal notes not otherwise available to Lanter Delivery in the normal course of its business with the Pepper Companies), bonus, special and daily rate information for these employees and drivers.

99.     Lobov also sent the following emails containing confidential and proprietary information of Pepper Companies from his Logistics Resource Solutions email address to his personal email account:

    a.  Subject line "Driver performance," August 22, 2020, 10:22 AM with an Excel spreadsheet attached titled "GM Dedicated driver scorecard.xlsx"

    b.  Blank subject line, August 22, 2020, 8:25 AM with the following Excel spreadsheets attached titled

21

       i.   MASTER SHEET FOR ELD USE IN TEXAS.xlsx, which detailed the property of LRS Leasing which had been installed in the power units and trailers leased by Logistics Resource in Texas.

      ii.   TX Coverage as of 7.11.2020.xlsx, which included regions such as Houston, Roanoke San Antonio (sic), Austin, Abilene Lubbock (sic), and Corpus Christi.

     iii.   TX Driver Report card as of 12.04.19.xlsx, which included regions such as Houston, Roanoke San Antonio (sic), Austin, Abilene Lubbock (sic), and Corpus Christi. This included internal company notes such as observations on drivers, customer complaints, status of training, tardiness issues as well as rate of pay

c.   Subject line "Driver performance," August 22, 2020, 8:15 AM with the following Excel spreadsheets attached titled

      iv.   James Sendejo replacement.xls. The Excel sheet in this spreadsheet bears the title "**CONFIDENTIAL_26ft+box+truck+dri**." This contained data relating to name, phone no., and job location of job candidates.

      v.   112 route replacement.xls. The Excel sheet in this spreadsheet bears the title "**CONFIDENTIAL_Box+truck+drivers+**." This contained data relating to name, phone no., and job location of job candidates.

      vi.   Elp.1 candidates.xls. The Excel sheet in this spreadsheet bears the title "**CONFIDENTIAL_26ft+box+truck+dri**." This contained data relating to name, phone no., and job location of job candidate

      vii.  Corpus Christi Specials Log 8.08.20.xlsx. This included such sheets in the Excel spreadsheet as the Maintenance & Fuel Calculator and the Specials Log.

d.  Subject line "San Antonio Pay," August 22, 2020, 8:08 AM with the following Excel spreadsheets attached

      viii.  San Antonio Drive WE 08.15.2020.xlsx. This sheet included the position of each such driver by name, vehicle type, and Las Six of EFS Card for both active and terminated drivers.

      ix.  San Antonio Payroll_8.15-2020_.xlsx. This was the same payroll information discussed above, but ended for the week ending August 15, 2020.

      x.  San Antonio Specials Log 7.25.20.xlsx.

      xi.  Timeless-San Antonio Lead Driver Route Coverage w.e 7.25.2020.xlsx

e.  Subject line "Austin pay," August 22, 2020, 8:01 AM with Excel spreadsheets attached which followed the same format as described in subparagraph (d) above.

f.  Subject line "Fw: Abilene Pay," August 22, 2020, 7:57 AM with Excel spreadsheets attached which followed the same format as described in subparagraph (d) above.

g.  Subject line "Fw: ROANOKE PAY," August 22, 2020, 8:08 AM with Excel spreadsheets attached which followed the same format as described in subparagraph (d) above.

> h. Subject line "Fw: ATTACHMENTS," August 22, 2020, 7:53 AM with an
> Excel spreadsheet attached titled "Roanoke Payroll_8.15.2020.xlsx."

100.    In so doing, Anton Lobov was acting at the direction of, and as an agent for, Lanter Delivery, White Line, Darien Brokerage, and Ryder in furtherance of their scheme and conspiracy.

101.    Upon information and belief, the information of Pepper Companies alleged above was emailed to Lanter Delivery offices in St. Louis, Missouri in furtherance of the conspiracy.

102.    On Sunday, August 23, 2020, Randi Wood was instructed by Kevin Bontemps at Lanter Delivery to

> NOT forward any payroll info to ISP today/tomorrow for last week (w/e 8-22-20).
> This information should be forwarded to  fieldsupport@logadmins.com
> Pls cc me on those emails.

103.    The email address "logadmins.com" is a domain controlled by Lanter Delivery.

104.    Randi Wood did not forward payroll information to any of the Pepper Companies for the week ending August 22, 2020.

105.    In forwarding the payroll information to Kevin Bontemps and Lanter Delivery, she was providing confidential and proprietary information to Lanter Delivery to permit it to continue to carry out its plan to disable Pepper Companies.

106.    In so doing, Randi Wood was acting at the direction of, and as an agent for, Lanter Delivery, White Line, Darien Brokerage, and Ryder in furtherance of their scheme and conspiracy.

107.    The information of Pepper Companies alleged above was emailed to Lanter Delivery offices in St. Louis, Missouri in furtherance of the conspiracy.

108.    As another example, on Monday, August 24, 2020 11:32 AM, Antoine Wingard sent an email with the subject line "Payroll Documents" to Jeff Pentecost at Lanter Delivery. Therein, Wingard stated:

I've attached our payroll for reference.

1.      The Payroll copy is a base of what each driver would make each week if they didn't miss any days and didn't do any additional specials. The only exception to this one is Housekeeping. It is currently under Shawn White, but it does move to other drivers from time to time

2.      The Payroll 8/22/2020 is what each driver actually made for week ending 8/22/2020. It includes any specials and absences.

109.    In so doing, Antoine Wingard was acting at the direction of, and as an agent for, Lanter Delivery, White Line, Darien Brokerage, and Ryder in furtherance of their scheme and conspiracy.

110.    Upon information and belief, the information of Pepper Companies alleged above was emailed to Lanter Delivery offices in St. Louis, Missouri in furtherance of the conspiracy.

111.    Pepper Companies has learned that by, if not before, August 22, 2020, Lanter Delivery was communicating with, and receiving proprietary information of Pepper Companies from other current and/or (recently) former managers of Pepper Companies, such as Ken Hudson, Fred Bradley, Adam Hunley, Marcus Brinson, Daniel Scott Whitehead, John Bartlett, Joe Stephen, Marshall Morris, Eli Encarnacion, James Whirley, Jason Coffy, Brendon Kelly, Mark Cordsen, Lori Funk, Tom Orth, Teddy Cruz, Trevor Graening, Tyler Vinson, Cassie Desantiago, Randi Wood, Mike Sullivan, Clayton Jenison, Chris Edenfield, Allyson Dechant, Josh Lopez, Mike Tomasek, Kim Theobald, Ed Payne, Todd Rosenthal, Antoine Wingard, Nelson Daye, Ryan Kornas, Anthony Messina, Ray Banner, Annette Mellano, David Bryant, Ralph Thrasher, Ron Lapadula, Moses Gathuri, James Armstrong, Anton Lobov, Brian St. John, Reuben Gallegos, Charles Magana, Gavin Cheyne, Kedrice Green, Bastian Alvear, Stori Dewberry, Steve Allen, Eric Dockins, Dominique Dixon, David Suttles, and Rachel Tomasek via their Pepper Companies email addresses. These managers withheld payroll information from Pepper Companies to benefit Defendants, provided proprietary, confidential, and trade secret information to Defendants, and

otherwise plotted and planned with Defendants to further the scheme, plot, and plan to disable and kill Pepper Companies.

112.   These managers, upon direction by Lanter Delivery and White Line, also deprived Pepper Companies from access to that same payroll and payment information, stripping them of the ability to determine what payments were due to drivers and also stripping them of the ability to pay said drivers.

113.   In so doing, these office managers, managers, and regional managers were acting at the direction of, and as an agent for, Lanter Delivery, White Line, Darien Brokerage, and Ryder in furtherance of their scheme and conspiracy. At least one email with the subject line of "Transition next steps" was sent to these office managers, managers, and regional managers and provided them with talking points created by Lanter Delivery in St. Louis County, State of Missouri, to convince the drivers to transition to White Line, Darien Brokerage, and Lanter Delivery.

114.   Upon information and belief, these other managers of Pepper Companies, and other John Does, also provided proprietary and confidential information to Lanter Delivery and White Line.

115.   Additionally, on August 25, 2020, employees and agents of Lanter Delivery, who, upon information and belief were officed in St. Louis County, State of Missouri, emailed Mark Cordsen to "update" the Aurora, Colorado drivers to determine which Pepper Companies drivers had switched over to Lanter Delivery and White Line.

116.   Cordsen responded to these requests and emailed the "update" to Lanter Delivery offices in St. Louis, Missouri in furtherance of the conspiracy.

117.   To the extent these managers were still employed by Pepper Companies when they transmitted trade secret, confidential, and proprietary information to Lanter Delivery, White Line, Darien Brokerage, and Ryder, these managers were well in excess of any authority to do so.

26

118.    To the extent that these managers had "quit" and were working for Lanter Delivery and White Line when they transmitted trade secret, confidential, and proprietary information to Lanter Delivery, White Line, Darien Brokerage, and Ryder, these (now former) managers, were trespassing in the offices of Pepper Companies, had no legal right to be in the office(s) of Pepper Companies, and had no legal right to access said information.

119.    Independent Service has received notice from agencies in Utah that after August 22, 2020, inspections were performed by said agencies upon power units and trailers and other equipment in which Logistics Resource had a possessory interest but were illegal driven for the benefit of Lanter Delivery, White Line, and/or Darien Brokerage after Logistics Resource made it explicitly clear that its equipment was not authorized to be used.

120.    To add insult to injury, for the weeks after the initial Petition was filed in this lawsuit, Pepper Companies have continued to receive notice, citations, and fines from governmental agencies for traffic tickets and other governmental inspections on the power units and equipment taken from them by the conspirators which were incurred after August 22, 2020.

121.    White Line, Darien Brokerage, Ryder, and Lanter Delivery knowingly subjected Pepper Companies to additional liability by having their drivers utilize the power units and trailers leased by Pepper Companies.

### Ryder

122.    The role of Ryder was of prime importance to the scheme of the Defendants to disable and kill the Pepper Companies.

123.    In the years preceding the August 22 *coup d'état*, Lanter Delivery had caused fewer and fewer power units and trailers to be rented by Pepper Companies from vendors such as Penske Truck Leasing Co., L.P. so that Ryder was the prime vendor to Pepper Companies.

124.   Upon information and belief, this was because Lanter Delivery had a relationship with Ryder that included:

     a.   Ownership by the same investment group, EGI, which owns a large percentage of Lanter Delivery's sole member, and associated entities, as well as Ryder and its parent entity.

     b.   A close, personal relationship between Bo Lanter and Kevin Butterfield, an executive at Ryder.

125.   Upon information and belief, Ryder had actively participated in the conspiracy to disable and kill the Pepper Companies for as many as nine months, and perhaps even more, prior to August 22, 2020.

126.   Ryder's participation to the scheme was critical, because it did not have the hundreds of power units readily on hand for White Line to use to transport Lanter Delivery contracted shipments without using those power units which were already validly leased to Pepper Companies.

127.   Ryder, Lanter Delivery, White Line, and the other conspirators knew that unless the drivers who Lanter Delivery and White Line hoped to entice away from the valid independent contractor agreements with Pepper Companies, had a power unit to pilot and trailers to carry the shipments, the disable and kill scheme would fail.

128.   In fact, the use of the power units was the fulcrum upon which the entire scheme balanced.

129.   Accordingly, upon information and belief, mechanics at the direction of Ryder and/or other members of the scheme, secretly re-keyed the ignition to the power units to which Pepper Companies had a valid possessory interest when said power units were parked overnight at a parking lot to which Ryder had access and control.

130.   The usual procedure for drivers for Pepper Companies when returning from a delivery was:

      a.   The driver would park the power unit,

      b.   The driver would perform post-trip inspections and paperwork,

      c.   The driver would turn in said post-trip inspections and paperwork to an agent of the Pepper Companies at an office to which agents of Lanter Delivery also had access, and

      d.   The driver would return keys to the power unit to a master key box at an office to which agents of Lanter Delivery also had access.

131.   Upon information and belief, as part of the conspirators' scheme, at times when agents of Pepper Companies were not present, mechanics and other agents of Ryder would surreptitiously gain access to the master key box and use keys assigned to specific power units leased by Pepper Companies from said master key box to access said power units.

132.   Mechanics and other agents of Ryder could then re-key the power units leased by Pepper Companies and return *new* keys to the master key box, all unbeknownst to Pepper Companies.

133.   Upon information and belief, Ryder and other members of the scheme retained copies of the new keys by which Defendants could gain access to, and drive, the power units to which Pepper Companies had a valid possessory interest.

134.   In this way, Defendants could be assured that, as long as agents of Pepper Companies were denied access to the master key box, Pepper Companies could not access the power units with any copies of keys to the power units Pepper Companies may have held in reserve.

135.    Agents for Ryder and/or the other Defendants re-keyed the ignition to the power units leased by Pepper Companies without the knowledge of Pepper Companies.

136.    As this process had to be performed for hundreds of units, all at times in which agents of Pepper Companies were not present to observe this surreptitious and conspiratorial behavior, it took months to complete the task of re-keying the power units to be ready on August 22, 2020.

137.    Further, Ryder and its agents performed other key roles in the scheme to disable and kill Pepper Companies.

138.    On the morning of the *coup d'état*, August 22, 2020, agents of Ryder met the drivers of Pepper Companies as they pulled into the parking lot. It was not in any way normal procedure for Ryder to meet the power units and trailers as the drivers returned from deliveries.

139.    In fact, on August 22, 2020, agents of Ryder took the additional following actions furtherance of the conspiracy:

      a.   They stopped the drivers as they pulled into the parking lot,

      b.   They instructed the drivers to give them the keys to the power units,

      c.   They instructed the drivers to remove all personal property from the power unit,

      d.   Upon information and belief, they did not provide time to the drivers for them to perform the necessary post-trip inspections and paperwork,

      e.   They moved the power units to a part of the parking lot not typically used by Pepper Companies trucks or moved them to a remote parking area altogether, such as lots at airports and other remote areas,

      f.   They then boxed the power units to which Pepper Companies had a possessory interest in with other trucks and trailers not related in any manner to Pepper

        Companies so that they could not be moved by any entity other than Ryder or its

        agents,

g.  They actively sought to deprive Pepper Companies possession of the power

        units, and trailers, to which it had a possessory interest,

h.  Ryder took possession of the power units, trailers, and Pepper Electronic

        Equipment until this property was turned over to the drivers working at the

        direction of White Line and Darien Brokerage, and paid by Lanter Delivery,

i.  To the extent necessary, Ryder provided additional power units and trailers to

        White Line for drivers coerced to prematurely break their agreements with

        Pepper Companies to perform deliveries for White Line and Darien Brokerage

        for the benefit of Lanter Delivery, and

j.  Ryder interfered with the business expectancy of Pepper Companies that the

        drivers and independent contractors would not breach the written agreements

        with Pepper Companies and that the employees of Pepper Companies would not

        breach their duties of loyalty and fiduciary duties.

140.    Upon information and belief, this coordinated action by Ryder, its agents and mechanics occurred at each and every terminal and/or lot across the country at which Pepper Companies used to park power units and trailers between deliveries in the months prior to, and on, August 22, 2020.

141.    This coordination required Ryder, in the months prior to August 22, 2020, to hand down communication to their regional and district managers to assign Ryder personnel to perform tasks in furtherance of the conspiracy to deprive Pepper Companies of access to its drivers, power units, and trailers.

142.     Pepper Companies could not have moved the power units to which it had a possessory interest because Ryder had re-keyed said power units.

143.     As part of the disable and kill plot, Lanter Delivery also sent correspondence, via electronic mail, originating in St. Louis County, State of Missouri, to Ryder on August 22, 2020 stating that:

   a.   Lanter Delivery terminated its business relationship with Timeless Logistical; and

   b.   The Limited Collection Facilitation and Assumption Agreement between Lanter Delivery and Ryder, adversely impacted the agreement between Logistics Resource and Ryder.

144.     This of course was on the *same day* that Pepper Companies learned that Lanter Delivery was terminating its relationship(s) with Timeless Logistical and thereby its business relationship with the Pepper Companies.

145.     The correspondence between Lanter Delivery and Ryder was, upon information and belief, planned well in advance and predicated upon what is believed to be a shared ownership interest between Lanter Delivery and Ryder and Ryder's participation in the conspiracy against Pepper Companies.

146.     Through the scheme, coordination, and efforts of Lanter Delivery, White Line, Darien Brokerage, the former drivers of Pepper Companies, faithless employees of Pepper Companies, Ryder, and other members of the scheme, all of which was planned in St. Louis County, State of Missouri, Logistics Resource's *possession* of all its leased equipment from Ryder, except about fourteen of the nearly 1,000 units, was stripped away on August 22, 2020.

32

147.   Even though the equipment for which Logistics Resource still had a valid and enforceable possessory interest should have remained in the possession of Logistics Resource, this equipment, these approximately 1,000 units of equipment, were either:

    a.  being used for Lanter Delivery's benefit by drivers and independent contractors who were no longer contracted by Pepper Companies; and/or

    b.  despite assurances to the contrary, Ryder, Lanter Delivery, and their agents, employees, and representatives, misrepresented to Logistics Resource that they could access the leased equipment at any time.

148.   Simply put, the newly-converted drivers of Lanter Delivery, White Line, and Darien Brokerage changed where their paychecks were coming from on August 22, got back in the power units and trailers leased by Logistics Resource and drove off to make money for Lanter Delivery, White Line, and Darien Brokerage, all who were allied with Ryder.

149.   Logistics Resource at all times kept current the insurance on this leased equipment.

150.   Further, Lanter Delivery did not cooperate with Logistics Resource to provide access to Logistics Resource's equipment.

151.   As part of the scheme to disable and kill Pepper Companies, Lanter Delivery and/or its independent contractors, representatives, and/or agents in White Line and/or Darien Brokerage logged thousands of unauthorized miles between August 22 and August 30 on power units and trailers exclusively leased and insured by Pepper Companies.

152.   Ryder also contacted Centurion Container in an effort to pick up additional power units and trailers which were unrelated to any agreement Ryder had which related to Lanter Delivery.