## UNITED STATES DISTRICT COURT
## SOUTHER  DISTRICT OF FLORIDA

Case No. 21-21573-CIV-LENARD/LOUIS

RYDER TRUCK RENTAL, INC.

      Plaintiff,

vs.

LOGISTICS RESOURCE
SOLUTIONS, INC.,

      Defendant.

_____/

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTER-CLAIM

COMES NOW, the Defendant, LOGISTICS RESOURCE SOLUTIONS, INC., and answers the Complaint, files its affirmative defenses and counterclaim and states:

1.     Admits Ryder is a corporation in Florida;

2.     Admits Logistics Resource Solution, Inc., is an Illinois corporation;

3.     Denies in part that venue is proper in Dade County because the Plaintiff has been sued in Missouri, in case number 4:20-cv-01444 and has filed motions and other pleadings in that court;

4.     Admits in part and denies in part. Denies that venue is proper when the Plaintiff has been sued in Missouri prior to the filing of this lawsuit and has engaged in forum shopping;

5.     Admits;

6.     Admits;

7.     Admits in part but denies it is a binding agreement in that the Plaintiff has breached the contract, thus voiding it;

8.      Admits in part but denies that the charges are valid and denies the amounts are valid;

9.      Denies that there was a default due to Plaintiff's conduct;

10.     Admits in part but alleges it was the Plaintiff's conduct that caused the default;

11.     Admits in part but denies damages;

12.     Denies in that the paragraph is conclusory in nature;

13.     Admits leased vehicles but alleges it was the Plaintiff's conduct that caused the default;

14.     Denies in that it is unknown what the Plaintiff learned;

15.     Admits Plaintiff sent a letter. Denies the balance of the paragraph in that the allegations are conclusory in nature;

16.     Denied;

17.     Admits letter, denies the balance of the paragraph;

18.     Denied in that there is no documentation attached to the complaint indicating a cancellation;

19.     Denied and alleges it was the Plaintiff's conduct that caused the default;

20.     Admits in part and denies damages to the trucks and alleges it was the Plaintiff's conduct that caused the default;

21.     Denies damages to the trucks;

22.     Defendant reincorporates all prior answers to the complaint;

23.     Admits rental agreements, denies breach and alleges it was the Plaintiff's conduct that caused the default;

24. Admits in part, denies damages to the trucks and alleges it was the Plaintiff's conduct that caused the default;

25. Admits in part and alleges it was the Plaintiff's conduct that caused the default;

26. Admits in part and alleges it was the Plaintiff's conduct that caused the default;

27. Denied;

28. Denied.

**AFFIRMATIVE DEFENSES**

**1st AFFIRMATIVE DEFENSE**

29. The Plaintiff conspired with other persons and parties to wrongfully take the trucks from the Defendant and to be utilized by other parties during the time period that the contract was enforced and therefore, it was the Plaintiff's conduct that caused any alleged default.

**2nd AFFIRMATIVE DEFENSE**

30. The Plaintiff converted the trucks for their own use or for the use of others by conspiring in advance to take the trucks and give them to other persons or entities that are currently using the trucks that are the subject matter of this litigation.

**3rd AFFIRMATIVE DEFENSE**

31. The Plaintiff interfered with the business relationship with other persons and entities to take control and possession of the trucks and to give them to others to use while the parties were still in a contractual relationship.

**4th AFFIRMATIVE DEFENSE**

32. The Plaintiff alleged they anticipated a breach of contract. There was no court order determining the anticipatory breach and prior to any alleged breach, the Plaintiff took

control of the trucks and gave them to other parties and entities to use, thus breaching the contract with the Defendant.

## 5th AFFIRMATIVE DEFENSE

33.     The Plaintiff has breached the contract by converting the trucks for others' use and depriving the Defendant of the use of the trucks.

## COUNTER-CLAIMS

## COUNTER-CLAIM FOR INJUNCTIVE RELIEF AND DAMAGES

Defendant/Counter-Claimant, Logistics Resource Solutions, Inc. ("LRS"), for their cause(s) of actions against Plaintiff/Counter-Defendant, Ryder Truck Rental, Inc. ("Ryder"), states, avers, and alleges as follows:

1.     This lawsuit arises from the coordinated plan of Plaintiff/Counter-Defendant, Ryder, to disable and kill Defendant/Counter-Claimant, LRS, by unlawfully depriving Defendant/Counter-Claimant of the very means by which it operates its logistics and delivery companies.

2.     Plaintiff/Counter-Defendant, its agents and co-conspirators devised a plan and orchestrated it out of the Plaintiff/Counter-Defendant's headquarters in St. Louis County, State of Missouri on August 22, 2020.

3.     Plaintiff/Counter-Defendant's scheme included: hijacking and converting approximately 1000 vehicle power units and trailers (tractor-trailers), which belonged to Defendant/Counter-Claimant; stealing and withholding payroll information; wrongly and tortuously interfering with contracts that the Pepper Companies had with about 700 drivers who were independent contractors ("drivers"); having said drivers drive for Ryder in violation of the Federal Motor Carrier Safety Regulations ("FMCSR"); unlawfully accessing the Pepper Companies'

confidential information; and illegally withholding the Pepper Companies' protected property.

4.      Simply put, Ryder carefully planned and orchestrated a plot that was a coup d'etat.

5.      Defendant/Counter-Claimant, LRS, filed this cause of action in an effort to save their businesses from the calculated schemes, artifices, statutory and regulatory violations, and other actions of Ryder to disable Defendant/Counter-Claimant and put them out of business.

## PARTIES, JURISDICTION, AND VENUE

6.      Defendant/Counter-Claimant, Logistics Resource Solutions, Inc., is an Illinois Corporation, registered to do business in the State of Missouri, with a primary address of 1600 Wayne Lanter Drive, Madison, IL 62060.

7.      Ryder Truck Rental, Inc. d/b/a Ryder Transportation Services, is a Florida for-profit corporation, registered to do business in the State of Missouri, with its corporate headquarters located at 11690 NW 105th Street, Miami, FL 33178, and with place of business throughout the United States, including within the jurisdiction of this Court.

8.      This Court has jurisdiction over Plaintiff/Counter-Defendant, because the causes of action asserted against them arise out of the transaction of business or the making of contracts within the State of Missouri, and because the tortuous conduct alleged herein occurred in the State of Missouri and/or occurred so that the effect of the tortuous conduct was aimed at the State of Missouri and the Defendant/Counter-Claimant reasonably anticipated that their tortuous conduct would cause them to be haled into the courts of the State of Missouri.  The Plaintiff/Counter-Defendant Ryder is currently being sued in the State of Missouri. There is a pending Motion to Dismiss in that case. However, Ryder, in spite of having a pending lawsuit in Missouri has filed a second lawsuit in this Court. Therefore, jurisdiction is proper in this Court depending on the outcome of the Motion to

Dismiss in Missouri. Counsel is obligated to file these counter-claims and third party complaints due to Ryder filing suit in this Court.

9.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1367, 1441, 1446, and venue in this Court is proper pursuant to 28 U.S.C. § 1441(a).

## BACKGROUND FACTS RELATING TO ALL COUNTS

10.     LRS is owned by Jim Pepper. Jim Pepper is also the owner of C. Pepper, Timeless Logistical, Independent Service, Interstate Service, Logistics Resource, and LRS Leasing (the "Pepper Companies"), as well as Pepper Electronic Property.

11.     This lawsuit arises out of the tortuous and wrongful conduct and schemes of Plaintiff/Counter-Defendant which were orchestrated from the headquarters of Ryder Truck Rental, Inc., St. Louis County. As described in more detail below, Plaintiff/Counter-Defendant improperly:

a.      Hijacked, converted, and took possession of approximately 1000 power units and trailers in which LRS had an exclusive possessory leasehold interest from Ruder, Penske, and others;

b.      Took possession of LRS Leasing's electronic property, which was located within the power units and trailers described above;

c.      Caused drivers to breach their independent contractor agreements or brokerage agreements;

d.      Caused managers and other employees to breach their duties of loyalty and fiduciary duties;

e.      Caused managers and employees to violate the Trade Secrets Acts and Defend Trade Secrets Act and transmit properietary and confidential information to Lanter Delivery, White Line, and Darien Brokerage (companies owned by Steve Lanter

and Bo Lanter, who were parties to the conspiracy scheme);

    f.      Violated the FMCSR, 49 C.F.R. §§ 390 and 391, by having drivers drive without a valid "application for employment" or a valid pre-employment controlled substances and alcohol test, or valid placards on their trucks;

    g.     Unlawfully coerced and/or abetted drivers to violate the FMCSR in violation of 49 C.F.R. §§ 390.6(a) and 390.13;

    h.     Violated FMCSR, (49 C.F.R. § 376), by utilizing LRS equipment without valid leases from LRS, of which they had the right to exclusively use said equipment; and

    i.      Tortuously interfered with LRS by causing lessors to breach lease agreements relating to the lease of equipment.

12.     As alleged herein below, each member of the conspiracy committed a wrongful act in furtherance of the conspiracy which permits conspirators to be liable for the wrongful acts alleged herein.

## RYDER

13.     The role of Ryder was of prime importance to the scheme of disabling and killing LRS and the Pepper Companies.

14.     On August 22, 2020, there was a coup d'etat.

15.     In the years preceding the August 22 coup d'etat, Lanter Delivery had caused fewer and fewer power units and trailers to be rented by LRS from vendors such as Penske Truck Leasing Co., L.P. so that Ryder was the prime vendor to Defendant/Counter-Claimant and the Pepper Companies.

16.     Upon information and belief, this was because Lanter Delivery had a relationship

with Ryder that included:

    a.    Ownership by the investment group, EGI, which owns a large percentage of Lanter Delivery's sole member, and associated entities, as well as Ryder and its parent entity.

    b.    A close, personal relationship between Bo Lanter and Kevin Butterfield, an executive at Ryder.

17.    Upon information and belief, Ryder had actively participated in the conspiracy to disable and kill the Pepper Companies for as many as nine months, and perhaps even more, prior to August 22, 2020.

18.    Ryder's participation to the scheme was critical, because it did not have the hundreds of power units readily on hand for White Line to use to transport Lanter Delivery contracted shipments without using those power units which were already validly leased to Pepper Companies.

19.    Ryder, Lanter Delivery, White Line, and other conspirators knew that unless the drivers who Lanter Delivery and White Line hoped to entice away from the valid independent contractor agreements with Pepper Companies, had a power unit to pilot and trailers to carry the shipments, the disable and kill scheme would fail.

20.    In fact, the use of the power units was the fulcrum upon which the entire scheme balanced.

21.    Accordingly, upon information and belief, mechanics, at the direction of Ryder and/or other members of the scheme, secretly re-keyed the ignition to power units to which the Pepper Companies had a valid possessory interest when set power units were parked overnight at

a parking lot to which Ryder had access and control to.

22. The usual procedure for drivers of the Pepper Companies returning from a delivery was:

a. The driver would park the power unit;

b. The driver would perform post-trip inspections and paperwork;

c. The driver would turn in said post trip inspections and paperwork to an agent of the Pepper Companies at an office to which agents of Lanter Delivery also had access; and

d. The driver would return the keys to the power unit in a master key box at an office to which agents of Lanter Delivery also had access to.

23. Upon information and belief, as part of the conspirators scheme, at times when agents of LRS were not present, mechanics, and other agents of Ryder would surreptitiously gain access to the master key box and use keys assigned to specific power units leased by LRS from said master key box to access and power units.

24. Mechanics and other agents of Ryder re-keyed the power units leased by LRS and returned the new keys to the master key box, all unbeknownst to LRS.

25. Upon information and belief, Ryder and other members of the scheme retained copies of the new keys by which Plaintiff/Counter-Defendant could gain access to, and drive the power units to which LRS had a valid possessory interest.

26. In this way, Defendant/Counter-Claimant would be assured that, as long as agents of LRS were denied access to the master key box, LRS could not access the power units with any copies of keys to the power units which LRS may have held in reserve.

27. Agents for Ryder and/or the others rekeyed the ignition to the power units leased

by LRS without the knowledge of LRS.

28.    As this process had to be performed for hundreds of units, at all times in which agents of LRS were not present to observe this surreptitious and conspiratorial behavior, it took months to complete the task of rekeying the power units to be ready on August 22, 2020.

29.    Further, Ryder and its agents performed other key roles in the scheme to disable and kill LRS.

30.    On the morning of the coup d'etat, August 22, 2020 agents of Ryder met the drivers of the Pepper Companies/LRS as they pulled into the parking lot. It was not in any way normal procedure for Ryder to meet the power units and trailers as the drivers returned from deliveries.

31.    In fact, on August 22, 2020, agents of Ryder took the additional following actions in furtherance of the conspiracy:

a.    The stopped the drivers as they pulled into the parking lot;

b.    They instructed the drivers to give them the keys of the power units;

c.    They instructed the drivers to remove all personal property from the power unit;

d.    Upon information and belief, they did not provide time for the drivers to perform the necessary post trip inspections and paperwork;

e.    They moved the power units to a part of the parking lot not typically used by the Pepper Companies trucks and were moved to a remote parking area altogether, such as lots at airports and other remote areas;

f.    They then boxed the power units to which the Pepper Companues had a possessory interest in with other trucks and trailers not related in any manner to Pepper Companies/LRS so that they could not be moved by any entity other than

Ryder or its agents;

g.    They actively sought to deprive the Pepper Companies/LRS possession of the power units and trailers to which it had posessory interest;

h.    Ryder took possession of the power units, trailers, and Pepper Electronic Equipment until this property was turned over to the drivers working at the direction of White Line and Darien Brokerage, and paid by Lanter Delivery;

i.    To the extent necessary, Ryder provided additional power units and trailers to White Line, and caused drivers to prematurely break their agreements with Pepper Companies to perform deliveries for White Line and Darien Brokerage, for the benefit of Lanter Delivery; and

j.    Ryder interfered with the business expectancy of the Pepper Companies/LRS that the drivers and independent contractors would not breach their written agreements with Pepper Companies/LRS and that the employees of Pepper Companies/LRS would not breach their duties of loyalty and fiduciary duties.

32.    Upon information and belief, this coordinated action by Ryder, its agents and mechanics occurred at each and every terminal and/or lot across the country at which Pepper Companies/LRS used to park power units and trailers between deliveries in the months prior to, and on, August 22, 2020.

33.    This coordination required Ryder, in the months prior to August 22, 2020, to hand down communication to the original district managers to assign Ryder personnel to perform tasks in furtherance of the conspiracy to deprive Pepper Companies/LRS of access to its drivers, power units, and trailers.

34.     The Pepper Companies/LRS could not have moved the power units to which it had a possessory interest because Ryder had rekeyed said power units.

35.     As part of the disable and kill plot, Lanter Delivery also sent correspondence via electronic mail, originating in St. Louis County, State of Missouri, to Ryder on August 22, 2020 stating that:

a.      Lanter Delivery terminated its business relationship with Timeless Logistical (a Pepper Company); and

b.      The Limited Collection Facilitation and Assumption Agreement between Lanter Delivery and Ryder, adversely impacted the agreement between LRS and Ryder.

36.     This of course is on the same day that Pepper Companies learned that Lanter Delivery was terminating its relationships with Timeless Logistical and thereby, its business relationship with the Pepper Companies.

37.     The correspondence between Lanter Delivery and Ryder was, upon information and belief, planned well in advance and predicated upon what it believed to be a shared ownership interest between Lanter Delivery and Ryder, and Ryder's participation in the conspiracy against the Pepper Companies.

38.     Through the scheme, coordination, and efforts of Lanter Delivery, White Line, Darien Brokerage, former drivers of Pepper Companies, faithless employees of Pepper Companies, Ryder and other members of the scheme, all of which was planned in St. Louis County, State of Missouri, LRS's possession of all its leased equipment from Ryder, except about 14 of the nearly 1000 units, was stripped away on August 22, 2020.

39.     Even though the equipment for which LRS and enforceable possessory interest should have remained in the possession of LRS, this equipment, these approximately 1000 units of equipment, were either:

a.      Being used for Lanter Delivery's benefit by drivers and independent contractors who were no longer contracted by Pepper Companies; and/or

b.      Despite assurances to the contrary, Ryder, and its agents, employees, and representatives, misrepresented to LRS that they could access the leased equipment at any time.

40.     Simply put, the newly converted drivers of Lanter Delivery, White Line, and Darien Brokerage change when their paychecks were coming from on August 22, got back in the power units and trailers leased by LRS, and drove off to make money for Lanter Delivery, White Line, and Darien Brokerage, who are all allied with Ryder.

41.     LRS at all times kept current the insurance on this leased equipment.

42.     As part of the scheme to disable and kill the Pepper Companies, Ryder along with Lanter Delivery and/or its independent contractors, representatives, and/or agents in White Line, and/or Darien Brokerage logged thousands of unauthorized miles between August 22 and August 30, 2020, on power units and trailers exclusively leased and insured by Pepper Companies.

43.     Ryder also contracted Centurion Container in an effort to pick up additional power units and trailers which were unrelated to any agreement Ryder had, but which related to Lanter Delivery.

44.     Lanter Delivery did extend a small window of time on August 30, 2020 to the Pepper Companies to retrieve office equipment from the office maintained on property, which was leased by Lanter Delivery.

**OTHER VENDORS**

45.     Dedicated Equipment Solutions, LLC, a company that is related to the rental of the equipment in Montana comprised of pickup trucks and trailers, is claiming that LRS defaulted.

46.     On August 22, counsel for LRS received a notice of default and termination from Dedicated Equipment Solutions, LLC.

47.     The payment for said lease had been timely authorized and issued by LRS on August 10, 2020, pursuant to invoice number 202007T. However, it was apparently never received.

48.     LRS has no knowledge as to why its payment would not of been received by Dedicated Equipment Solutions, LLC other than its delivery was handled by Rachel Tomasek.

49.     Rachel Tomasek, Mike Tomasek, Anton Lobov, Antoine Wingard, Mark Cordsen, Randi Wood, and John Does, all of whom were office managers, area managers, and regional managers of the Pepper Companies, were part of the scheme, plan, coordination, and concerted efforts to in Plaintiff/Counter-Defendant's conspiracy, plot, and plan to disable and kill the Pepper Companies.

50.     Rachel Tomasek had no independent authority to delay or fail to deliver any payment to be made on behalf of LRS.

51.     Further, on August 20, 2020, LRS received a demand from Ryder to return certain units and equipment rented from Ryder and make contracts separate and apart from any Ryder contract relating to Lanter Delivery, which were rented on a short-term basis to service Logistic Resource's Centurion Container, LLC ("Centurion") account.

52.     LRS was current on the lease/rental with Ryder for the leased equipment, which was rented to service its Centurion account.

## ELECTRONIC PROPERTY OWNED BY PEPPER COMPANIES

53.     In each vehicle power unit, LRS Leasing purchased and had the following electronic items installed (hereinafter, "Pepper Electronic Property"):

a.      Geotab black boxes (ELD/GPS) were installed and connected to the power units onboard central processing unit (CPU). These were attached to the plug port located below the steering wheel. The accompanying black box was secured under the steering wheel with zip ties.

b.      Samsung tablets were mounted in a tablet holder on the power units dash.

c.      Drivecams Dash Camera Systems were mounted on the power unit's dash.

54.     This Pepper Electronic Property, which is worth hundreds of thousands of dollars in aggregate, remains in the possession of the Plaintiff/Counter-Defendant as part of their scheme.

55.     Due to Ryder's actions, White Line, Darien Brokerage, and their drivers are currently using the Pepper Electronic Property to meet the regulatory requirements under state and federal law, when there has been no authorization to do so.

## COUNT I:
## CONVERSION

56.     LRS hereby realleges and incorporates the allegations as set forth paragraphs 1-55 of the Counterclaim section, as though specifically set forth herein.

57.     The Pepper Companies had a current and valid possessory interest in approximately 1000 power units and trailers and any other equipment leased from Ryder and had legal possession of said equipment at the time the Pepper Companies were deprived of, as part of the scheme, plan, coordination, and concerted efforts of Plaintiff/Counter-Defendant and conveyed to them as alleged herein.

58.     The scheme to disable and kill the Pepper Companies was planned in, directed from, and coordinated with and by the Plaintiff/Counter-Defendant and others from St. Louis County, State of Missouri.

59.     At all relevant times, LRS, was and is the owner, and had legal possession of, the Pepper Electronic Property maintained inside the equipment leased from Ryder and from Dedicated Equipment Solutions, LLC.

60.     At all relevant times, as alleged in paragraphs herein below, Defendant/Counter-Claimant was and is the owner and had legal possession of the trade secret information on the computers owned by the Pepper Companies and improperly accessed by Rachel Tomasek, Mike Tomasek, Anton Lobov, Antoine Wingard, Mark Cordsen, Randi Wood, and John Does 1 through 30 as part of the scheme, plan, coordination, and concerted efforts with Plaintiff/Counter-Defendant to disable and kill LRS and the other Pepper Companies.

61.     At all relevant times, LRS was and is the owner and had legal possession of the confidential and proprietary information on the computers owned by the Pepper Companies which had not otherwise been available to Ryder in the ordinary course of their business dealings and which was improperly accessed by Rachel Tomasek, Mike Tomasek, Anton Lobov, Antoine Wingard, Mark Cordsen, Randi Wood, and John Does as part of the scheme, plan, coordination, and concerted efforts with Plaintiff/Counter-Defendant to disable and kill LRS and the other Pepper Companies.

62.     The Pepper Companies are entitled to the immediate possession of all Pepper Electronic Property and information taken by the Plaintiff/Counter-Defendant and all other involved entities.

63.     Pepper Companies demanded the return of all of the above property.

64.     Despite the demands of Pepper Company, the property identified above has not been returned to the Pepper Companies.

65.     As described in detail above, Ryder, White Line, Darien Brokerage, and Lanter Delivery, acting on their own behalf or through their agents, wrongfully took exclusive possession of approximately 1000 power units, trailers, and other equipment in which Pepper Companies had a possessory interest, and of the Pepper Electronic Property maintained inside the equipment leased from Ryder from Dedicated Equipment Solutions, LLC and of trade secrets, confidential, and proprietary information of Pepper Companies, and appropriated this for their own use in open defiance of Pepper Companies right to immediate possession thereof. The property includes, but is not limited to the possessory interest in the equipment by the Pepper Electronic Property, and trade secret, confidential, and proprietary information.

66.     Plaintiff/Counter-Defendant took possession of the proprietary information alleged above with the intent to exercise control to the exclusion of the Defendant/Counter-Claimant's right of ownership and possession. Plaintiff/Counter-Defendant has unlawfully come into possession of the property and unlawfully converted it, to the damage of the Defendant/Counter-Claimant.

67.     Although it is believed that the property is worth hundreds of thousands of dollars, at this stage of the lawsuit, it is impossible to determine the extent of the property taken and the exact value thereof.

68.     The actions of the Plaintiff/Counter-Defendant are both an extreme and outrageous motive and reckless disregard for the rights of the Defendant/Counter-Claimant.

WHEREFORE, Logistics Resource Solutions, Inc., respectfully request that this Court grant judgment in their favor and against the Plaintiff/Counter-Defendant, Ryder Truck Rental, Inc., and award monetary damages in an amount that is fair and reasonable, and in excess of $75,000 and deter like-conduct in the future, together with interest and attorney's fees and costs. Defendant/Counter-Claimant request such other and further relief as this Court may deem just and proper and demands trial by jury.

**COUNT II:**
**INJUNCTION PURSUANT TO MO. REV. STAT. 417.455 AND 765 ILCS 1065/3**

69.     LRS hereby realleges and incorporates the allegations as set forth paragraphs 1-55 of the Counterclaim section, as though specifically set forth herein.

70.     The confidential and proprietary information of C Pepper, Timeless Logistical, Independent Service, Interstate Service, Logistics Resource, and LRS Leasing constitutes trade secrets within the meaning of the respective uniform trade secrets acts in that there was a selective accumulation of information based on past purchasing, pricing, and selling experience, and cultivation of customers, employees, and independent contractors, and considerable time, money, and effort went into compiling the confidential and proprietary information of Pepper Companies.

71.     The confidential and proprietary information of C Pepper Time, Timeless Logistical, Independent Service, Interstate Service, Logistics Resource, and LRS Leasing derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

72.     The confidential and proprietary information of C Pepper, Timeless Logistical, Independent Service, Interstate Service, Logistics Resource, and LRS Leasing were subject to efforts reasonable under the circumstances to maintain the secrecy of said confidential and proprietary information by utilizing servers and computers which required a valid C Pepper, Timeless Logistical, Independent Service, Interstate Service, Logistics Resource, and LRS Leasing username and valid password to access said confidential and proprietary information, and limiting secured access to such information to only those necessary personnel.

73.     Ryder misappropriated trade secrets, knew, or had reason to know that the trade secrets were improperly obtained, when Ryder converted the trucks, made separate ignition keys for all the trucks, and then downloaded all of the data from the trucks and utilized said data to obtain the routes of the trucks and all other related data kept in the Counter-Claimant's proprietary software programs. The software program contained the trade secrets of the Counter-Claimant.

WHEREFORE, Logistics Resource Solutions, Inc., respectfully requests that this court grant judgment in its favor, and against Ryder Truck Rental, Inc. and ensure like conduct does not occur in the future, together with interest and attorneys' fees and costs, and such other and further relief as this Court may deem just and proper and demand trial by jury.

**COUNT III:**
**UNJUST ENRICHMENT**

74.     LRS hereby realleges and incorporates the allegations as set forth paragraphs 1-55 of the Counterclaim section, as though specifically set forth herein.

75.     Through the above alleged acts of Plaintiff/Counter-Defendant, which are part of their scheme, plan, coordination, and concerted efforts, they have wrongfully taken possession of

the trade secrets of Defendant/Counter-Claimant.

76.     Through the above alleged acts, which are part of the scheme, plan, coordination, and concerted efforts of the Plaintiff/Counter-Defendant, they have wrongfully taken possession of the confidential and proprietary information of the Defendant/Counter-Claimant, along with the equipment (including nearly 1000 power units and trailers) that was subject to valid leasehold interests, and of Pepper Electronic Property maintained in said equipment.

77.     Being pled in the alternative, as permitted by Florida and Federal law, Defendant/Counter-Claimant alleges that Plaintiff/Counter-Defendant has been unjustly enriched by obtaining the benefit of the trade secret, confidential, and proprietary information of Pepper Companies along with equipment that was subject to valid leasehold interests and Pepper Electronic Property maintained in said equipment without paying for its benefit.

78.     The trade secret, confidential, and proprietary information of Pepper Companies has value to Ryder, White Line, Darien Brokerage, and Lanter Delivery as it defines items which provide Plaintiff/Counter-Defendant with a competitive advantage, including but not limited to, employee salaries, amounts paid to drivers, customers, vendors, pricing, and any discounts to customers. The other property and equipment has value to Plaintiff/Counter-Defendant as indicated by the market value of said Pepper Electronic Property and equipment.

79.     The confidential and proprietary information of Pepper Companies has value to Plaintiff/Counter-Defendant as it provides them a competitive advantage, including, but not limited to, employees salaries, scheduling and availability of drivers, amounts paid to drivers, customers, vendors, pricing, and any discounts to customers, all of which was not previously available to Lanter Delivery in the ordinary course of business.

80. The other property and equipment which Plaintiff/Counter-Defendant took from Defendant/Counter-Claimant have value to Plaintiff/Counter-Defendant as indicated by the use, and by the market value, of said Pepper Electronic Property and equipment which is in the hundreds of thousands of dollars. Furthermore, Ryder did not have sufficient power units and trailers to provide transportation for the routes necessary for White Line and Darien Brokerage to meet the delivery needs of Lanter Delivery's customers.

81. Without the unjust enrichment as alleged above, Lanter Delivery would have been in breach of its delivery obligations with its customers. Lanter Delivery was thereby, enriched.

82. As a proximate cause of Plaintiff/Counter-Defendant's actions, Plaintiff/Counter-Defendant has and will continue to be unjustly enriched at the expense of Pepper Companies.

83. Plaintiff/Counter-Defendant acted with motive and intentional and reckless indifference to the rights and interests of Pepper Companies in the trade secret, confidential, and proprietary information of Pepper Companies, or of Defendant/Counter-Claimant's rights and interests in the personal property and equipment.

84. Plaintiff/Counter-Defendant should be required to disgorge their unjust enrichment.

85. It would be an equitable and just for Plaintiff/Counter-Defendant to retain the benefits of excessive utilizing the trade secret, confidential, and proprietary information of Pepper Companies or of the Pepper Electronic Property and Equipment.

WHEREFORE, Logistics Resource Solutions, Inc., respectfully requests that this Court grant judgment in their favor, and against Ryder Truck Rental, Inc. and deter like conduct in the future, together with interest and attorneys' fees and costs, and such other and further relief as this Court may deem just and proper and demands trial by jury.

## COUNT IV:
## <u>CLAIM PURSUANT TO 49 U.S.C. §14704</u>

86.     LRS hereby realleges and incorporates the allegations as set forth paragraphs 1-55 of the Counterclaim section, as though specifically set forth herein.

87.     Pursuant to 49 U.S.C. §14704 (a), LRS may bring a civil action for injunctive relief and damages for violations of 49 U.S.C. §14102 and the regulations promulgated thereunder.

88.     For the relevant period, LRS, was the "owner" of the equipment and had the right to exclusive use of equipment" pursuant to 49 C.F.R. §372.2.

89.     Ryder became an "authorized carrier", actual or apparent, to transport property under 49 U.S.C. subtitle IV, part B during all relevant times, when Ryder had separate keys made to gain illegal entry to the trucks and assisted the drivers in taking the trucks. They used the Counter-Claimant's DOT numbers, insurance, and all other information under 49 C.F.R. Parts 376 and 390.13, thereby, becoming an "authorized carrier."

90.     Further, Ryder aided, abetted, encouraged, or required an "authorized carrier" to violate 49 C.F.R. § 376 in violation of 49 C.F.R. §390.13 when Ryder converted the trucks, made separate ignition keys for all the trucks, and then downloaded all of the data from the trucks and utilized said data to obtain the routes of the trucks and all other related data kept in the Counter-Claimant's proprietary software programs which contained the trade secrets of the Counter-Claimant. Ryder made the keys to obtain illegal entry to the trucks and assisted the drivers in taking the trucks from the Counter-Claimant beginning August 20, 2020.

91.     Defendant/Counter-Claimant had the right to the equipment under the lease from Ryder. Ryder did not have a valid lease for the use of certain commercial vehicles but alleges it

had the right to obtain those vehicles under the terms of the existing lease. Ryder was acting as a

motor carrier or authorized carrier by and through the lease with Defendant, once they took

possession of the trucks.

92.     Due to Ryder's actions, the Pepper Companies were damaged when Ryder, Lanter

Delivery, White Line, and Darien Brokerage used the equipment and continue to use some of the

equipment without a written lease with Logistics Resource, the "owner" for Lanter Delivery,

White Line, and Darien Brokerage's benefit in violation of 12 C.F.R. §§ 376.11 and 376.12.

93.     Through the above alleged acts, which were part of the scheme, plan,

coordination, and concerted efforts of the Plaintiff/Counter-Defendant, LRS and the Pepper

Companies were damaged by this violation of the aforesaid federal statute and regulations, not

only by depriving LRS of its possessory interest in the equipment at issue, but also in facilitating

Plaintiff/Counter-Defendant's scheme to disable and kill LRS and the Pepper Companies.

94.     Through the above alleged acts, as a direct and proximate result, LRS and the

Pepper Companies were further damaged by having numerous DOT violations cited upon Pepper

Companies. After Ryder took possession of the power units, trailers, and Pepper Electronic

Equipment, Lanter Delivery, White Line, and Darien Brokerage were causing drivers to

unlawfully use the equipment at issue.

95.     Independent Service was contacted by authorities relating to inspections

performed on said equipment after August 22, 2020. For example on August 26, 2020, the unit

was pulled over for a DOT inspection in which the DOT contacted Independent Service.

96.     Through the above alleged acts, LRS and the Pepper Companies may be further

damaged in the future if it incurs any public liability from its equipment being involved in an

accident while being used by Ryder, whereby Pepper Companies could potentially be held liable under the "logo liability" and/or "lease liability" doctrines.

97.     Defendant/Counter-Claimant falls within the "zone of interest to be protect by the statute in question." The Defendant has standing to bring this action under 49 U.S.C. § 14102 in that Congress regulates leases between independent drivers and motor carriers. There exists a lease between Ryder and Counter-Claimant which allegedly was utilized to facilitate the independent truck drivers to take the trucks under the terms of the lease. The statute provides a remedy between carriers and independent truckers, lease and interchange vehicles, and to eliminate or reduce opportunities for the illegal or inequitable practices by motor carriers. Once Ryder took the trucks illegally or inequitably, they became a motor carrier under the statute and violated the terms and conditions of the statute by and through the lease.

98.     In bringing this cause of action, Pepper Companies are entitled to reasonable attorneys' fees pursuant to 49 U.S.C. § 14704(a).

WHEREFORE, Logistics Resource Solutions, Inc., respectfully request that this Court grant judgment in their favor, and against Ryder Truck Rental, Inc. and deter like conduct in the future, together with interest and attorneys' fees and costs, and such other and further relief as this Court may deem just and proper and demands trial by jury.

## COUNT V:
## CIVIL CONSPIRACY

99.     LRS hereby realleges and incorporates the allegations as set forth paragraphs 1-55 of the Counterclaim section, as though specifically set forth herein.

100.    Plaintiff/Counter-Defendant knowingly agreed in St. Louis County, State of Missouri, to conspire and did conspire to achieve the unlawful purpose of disabling and killing the Pepper Companies including LRS, through the actions and conduct described in the paragraphs above and below.

101.    In the course of their efforts in furtherance of their conspiracy, Ryder knowingly and purposely engaged in, though were not limited to, the following acts:

a.    Highjacked, converted, and took possession of hundreds of LRS's power units, trailers, and other equipment to which it had an exclusive possessory interest so that Ryder was unjustly enriched;

b.    Took possession of Pepper Electronic Property;

c.    Caused C Pepper, Timeless Logistical, Independent Service, Interstate Service's drivers to breach their independent contractor agreement or brokerage agreement;

d.    Caused C Pepper, Independent Service, and/or Logistics Resource's managers and other employees to breach their duties of loyalty and fiduciary duties;

e.    Caused C Pepper, Independent Service, and/or Logistics Resource's managers and employees to violate the trade secrets act and Defend Trade Secrets Act and transmit proprietary and confidential information of Pepper Companies to Lanter Delivery, White Line, and Darien Brokerage;

f.    Engaged in computer tampering;

g.    Violated the FMCSR (49 C.F.R. §§ 390 and 391) by having independent contractors/drivers drive without a valid "application for employment," and a valid pre-employment controlled substances and alcohol test, or valid placards on their trucks;

h.      Unlawfully coerced and/or abetted drivers to violate the FMCSR in violation of 49 C.F.R. §§ 390.69(a) and 390.13;

i.      Utilized promissory notes which Lanter Delivery had not previously intended to collect upon to leverage the financial hardship upon Plaintiff;

j.      Violated Federal Motor Carrier "Leasing Regulations" (49 C.F.R. § 376) by utilizing Logistics Resource's equipment without valid leases from Pepper Companies while Logistics Resource had the right to exclusively use said equipment;

k.      Tortuously interfered with Pepper Companies' business expectations with Non-Lanter Customers by causing lessors to breach lease agreements relating to the lease of equipment;

l.      Interfered with the ability of Pepper Companies to calculate the payroll and amounts due to drivers for the period ending August 22, 2020 and the ability to pay same; and

m.      Fraudulently induced LRS, Pepper Companies, and Pepper, to enter into Promissory Notes a Guaranty with Lanter Delivery.

102.      As alleged above, each member of the conspiracy committed a wrongful act in furtherance of the conspiracy.

103.      In addition, Plaintiff/Counter-Defendant cooperated, aided, and/or ratified each other's acts in furtherance of their conspiracy as alleged above.

104.      LRS and the Pepper Companies have suffered and will continue to suffer damages as a result of Ryder's acts in furtherance of its conspiracies.

105.     Ryder acted with evil motive and intentional and reckless indifference to the rights and interests of LRS, warranting the imposition of punitive damages.

106.     As a direct and proximate result of Ryder's wrongful conduct, LRS has been damaged.

107.     These actions were a conspiracy under Missouri law, Illinois law, and 18 U.S.C. § 1030(b).

WHEREFORE, Logistics Resource Solutions, Inc., respectfully request that this Court grant judgment in their favor, and against Ryder Truck Rental, Inc. and deter like conduct in the future, together with interest and attorneys' fees and costs, and such other and further relief as this Court may deem just and proper and demands trial by jury.

<u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was by e-service through the Court's CM/ECF system on <u>August 23, 2021</u> on all counsel or parties of record on the Service List below.

<u>/s/ Kenneth D. Cooper</u>
Kenneth D. Cooper, Esq.

**SERVICE LIST**

Crystal B. Carswell
ccarswell@huntonAK.com
Hunton Andrews Kurth LLP
333 SE 2nd Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-1690
Attorneys for Plaintiff/Counter-Defendant
Ryder Truck Rental Inc.